David J.F. Gross (SBN 290951)
Nick P. Chan (SBN 286925)
1950 University Avenue, Suite 450
East Palo Alto, CA 94303
Telephone: (650) 324-6700
Fax: (650) 324-6701
david.gross@FaegreBD.com
nick.chan@FaegreBD.com

Michael Jaeger (SBN 289364)
11766 Wilshire Blvd., Suite 750
Los Angeles, CA 90025
Telephone: (310) 500-2090
Fax: (310) 500-2091
michael.jaeger@FaegreBD.com

Timothy E. Grimsrud (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
Andrea I. Savageau (*pro hac vice*)
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Fax: (612) 766-1600
tim.grimsrud@FaegreBD.com
lauren.barta@FaegreBD.com
andrea.savageau@FaegreBD.com

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tissue Anchor Innovations, LLC, | Case No.: 8:19-CV-00791-JVS-ADS |
| Plaintiff, | **DEFENDANT BOSTON SCIENTIFIC CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF** |
| vs. | |
| Fountain Valley Regional Hospital and Medical Center, Los Alamitos Medical Center, and Boston Scientific Corporation, | |
| Defendants. | |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................ 1

II.    BACKGROUND ......................................................................................... 2

    A. The Parties. ........................................................................................ 2

    B. The '190 Patent. ................................................................................. 2

    C. The Accused Solyx Systems. ............................................................ 6

    D. The Astora Case. ............................................................................... 8

III.   LEGAL STANDARD ................................................................................ 10

IV.    UNDISPUTED TERMS ............................................................................ 10

V.     DISPUTED "PLUNGER" TERMS ........................................................... 11

    A. "plunger" / "a plunger slidably positioned in said housing" (Claim 1). .......... 12

       1.  The intrinsic evidence. ................................................................. 13

       2.  The extrinsic evidence. ................................................................ 16

    B. "said anchor being advanced away from said housing upon operation of said plunger" / "upon operation of said plunger" (Claim 1). ........................... 17

    C. TAI Should Be Estopped From Changing Its Position On "Plunger." ............ 18

VI.    DISPUTED "BARB END" TERMS ........................................................... 21

    A. "barb end . . . with a tip shaped to penetrate soft tissue" (Claim 1) ................. 21

       1.  The intrinsic evidence ................................................................. 22

       2.  The extrinsic evidence ................................................................. 24

    B. TAI Should Be Estopped From Changing Its Position On "Barb End." ......... 24

VII. CONCLUSION .......................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*,
5
    657 F.3d 1264 (Fed. Cir. 2011) .......................................................... 15

6

*Curtiss-Wright Flow Control Corp. v. Z & J Techs. GmbH*,
7
    563 F. Supp. 2d 1109 (C.D. Cal. 2007) ....................................... 19, 25

8

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ............................................................ 8
9

10

*Finjan, Inc. v. Symantec Corp.*,
    2017 WL 550453 (N.D. Cal. Feb. 10, 2017) ...................................... 11
11

12

*Hydranautics v. FilmTec Corp.*,
    204 F.3d 880 (9th Cir. 2000) .............................................................. 19

13

*Int'l. Gamco, Inc. v. Multimedia Games Inc.*,
14
    732 F. Supp. 2d 1082 (S.D. Cal. 2010) ....................................... 19, 25

15

*Kaneka Corp. v. Zhejiang Med. Co.*,
16
    No. CV1702389SJOSHSX, 2018 WL 2718036 (C.D. Cal. Apr. 5, 2018),
    *aff'd*, 767 F. App'x 998 (Fed. Cir. 2019) ........................................... 19
17

18

*Kruse Tech. P'ship v. DMAX, Ltd.*,
    No. CV0904970JVSRNBX, 2010 WL 11519252 (C.D. Cal. Sept. 21, 2010)
19
    (Selna, J.) ............................................................................................ 19

20

*Lampi Corp. v. Am. Power Prods., Inc.*,
21
    228 F.3d 1365 (Fed. Cir. 2000) .......................................................... 20

22

*Markman v. Westview Instruments, Inc.*,
23
    517 U.S. 370 (1996) ............................................................................. 8

24

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ................ 10
25

26

*Neev v. Alcon Labs., Inc.*,
    SACV1500336JVSJCGX, 2016 WL 9051170 (C.D. Cal. Dec. 22, 2016) ........ 19

27

28

*Neev v. Alcon Lensx Inc.*,
    774 F. App'x. 680 (Fed. Cir. 2019) ..................................................................... 19

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ............................................................................... 20, 25

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006) ........................................................................ 14

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).................................................... passim

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999) ....................................................................... 10

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
    653 F.3d 1296 (Fed. Cir. 2011) ....................................................................... 15

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ......................................................................... 10

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) ......................................................................... 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.     INTRODUCTION

Tissue Anchor Innovations, LLC ("TAI") never should have filed this case against Boston Scientific Corporation ("Boston Scientific").  The alleged invention of Claim 1 of U.S. Patent No. 6,506,190 ("the '190 Patent")[1] is a "tissue anchor system" having specific features, including a "tissue anchor" with a "barb end" having a "tip shaped to penetrate soft tissue," and a "delivery device" that has a "plunger," which upon operation "advances away" the tissue anchor.  Under constructions that ***TAI*** successfully advocated for and obtained in a prior lawsuit in the Eastern District of Virginia ("the *Astora* case"), it is clear that Boston Scientific's accused Solyx SIS Systems do not have these features and did not infringe any of the Asserted Claims prior to the expiration of the '190 Patent.[2]  Boston Scientific has told this to TAI, but TAI nonetheless continued with this case and is now trying to back-pedal away from its admissions and the court's rulings in the *Astora* case.

Boston Scientific therefore brings this motion for claim construction, seeking constructions for key terms that go directly to non-infringement.  For each of the disputed terms, Boston Scientific has proposed constructions that are consistent with both the claim language and the specification, which "is the single best guide to the meaning of a disputed term."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-18 (Fed. Cir. 2005) (*en banc*).  Boston Scientific's constructions are also consistent with the court's rulings in the *Astora* case, which TAI already agreed are binding.  (Dkt. 24 at 16 ("TAI agree[s] that TAI is bound by the constructions in [the *Astora*] case.").)  Accordingly, because Boston Scientific's proposed constructions of the disputed terms are not only consistent with the claim construction rulings in the *Astora* case, but also the claim language and specification, Boston Scientific requests that the Court adopt its proposed constructions.

---

[1] The '190 Patent was filed as Dkt. 1-1.
[2] The Asserted Claims are Claims 1, 4, and 8 of the '190 Patent.

1

## II.    BACKGROUND

**A.    The Parties.**

Boston Scientific is a medical device company that makes and sells life-saving and quality-of-life devices, including those used to treat patients with urogynecological conditions such as stress urinary incontinence.  TAI is an intellectual property holding company that purports to have taken an exclusive license to the '190 Patent.  TAI has never manufactured, sold, or commercialized urological products or any other medical device.

**B.    The '190 Patent.**

The '190 Patent expired on June 26, 2019, and is based on an application filed on May 21, 1999, which was in turn a continuation of an application filed on May 21, 1998.  The sole named inventor on the '190 Patent is Christopher J. Walshe.  The patent relates generally to a "tissue anchor and applicator for supporting a suture, sling member, or other device" used during surgical procedures aimed to treat urinary incontinence.  (Dkt. 1-1 at 1:4-11.)  TAI asserts Claims 1, 4, and 8 against Boston Scientific.  Notably, the "tissue anchor system" of the Asserted Claims includes only the "tissue anchor" and the tissue anchor "delivery device"—they do not claim a sling member or mesh.

Claim 1 of the '190 Patent—the only independent claim being asserted by TAI—recites:

> A tissue anchor system comprising a ***delivery device*** and a ***tissue anchor***, said delivery device having a housing, a ***plunger*** slidably positioned in said housing, said anchor having a ***barb end and a barb with a tip shaped to penetrate soft tissue*** positioned thereon, and an attachment member, said ***anchor being advanced away*** from said housing ***upon operation of said plunger***, said barb adapted to resist removal from a tissue once inserted.[3]

---

[3] All emphases added unless otherwise noted.

1    (Dkt. 1-1 at 19:38-45.)  The dependent Asserted Claims (4 and 8) simply recite that

2    the claimed housing is "hollow" and has "a finger grip."  (*See id.* at Cls. 4 and 8.)

3    ***The "plunger" of the "delivery device" is used to "advance" the tissue***

4    ***anchor by moving forward within the housing.***  The Asserted Claims all recite a

5    "delivery device."  (*See* Dkt. 1-1 at Cls. 1, 4, and 8.)  The delivery device of the

6    Asserted Claims includes a "housing," shown in blue below, and "a plunger slidably

7    positioned in said housing," shown in gray below.  (*See id.*)  "Plunger 5 has an

8    anchor end 10 adapted to engage an anchor 20 (not shown in Figure 2).  Anchor end

9    10 may be a flat end to ***push*** anchor 20 . . . Anchor end 10 can have any structure

10   engaging anchor 20 that allows plunger 5 to ***advance*** anchor 20 into a tissue and

11   uncouple therefrom, leaving anchor 20 in tissue."  (*Id.* at 5:67-6:11; FIG. 2; FIGs.

12   7a-7b; FIG. 13; 9:42-43 ("hollow barrel portion 7 is placed against the tissue, and

13   plunger 5 ***advanced***, forcing anchor 20 into tissue."); 10:67-11:1 ("Plunger 5 is

14   depressed and ***advances*** anchor 20.").)



(Dkt. 1-1 at FIG. 2 (annotated and colored).)

23        Moreover, as stated in Claim 1, the tissue anchor is "advanced away from [the]

24   housing upon operation of [the] plunger."  This is consistent with the specification,

25   which states that the delivery device "may optionally have a plunger assembly

26   slidably positioned in the housing to assist ***advancing*** the anchor into a tissue."  (*Id.*

27   at 2:62-64.)  The "plunger" is consistently described as being "advanced"—i.e.,

28

1  moved forward—in order to *advance* the tissue anchor away and into the tissue.

2  (*See, e.g.*, *id.* at FIGs. 7a-7b; FIG. 13; 6:9-11 ("Anchor end 10 can have any structure

3  engaging anchor 20 that allows plunger 5 to *advance* anchor 20 into a tissue and

4  uncouple therefrom, leaving anchor 20 in tissue."); 9:33-36 ("When hollow barrel

5  portion 7 has *advanced* so that sharp end 125a clears the tissue or is embedded

6  within, plunger 5 is *advanced*, releasing anchor 20."); 9:41-46 ("In this embodiment,

7  hollow barrel portion 7 is placed against the tissue, and plunger 5 *advanced*, forcing

8  anchor 20 into tissue."); 10:67-11:2 ("Plunger 5 is depressed and *advances* anchor 20

9  into the space anterior to the sacrum but just beneath the anterior longitudinal spinal

10  ligament."); 16:34-36; 17:2- 8; 19:12-14 ("Generally, anchor 20 will be placed

11  against the desired placement location, and *advanced* through the scope, using a

12  rigid or flexible plunger 5.").)

13      Further, the only series of figures in the '190 Patent that shows step-by-step

14  the movement of a plunger in relation to a housing and an anchor, shows the plunger

15  (shown in gray below) moving forward within the housing (shown in blue below) to

16  move the anchor (shown in yellow below) into the tissue (shown in pink below):



17–27  FIGURE 16a    FIGURE 16b    FIGURE 16c

28  (*See* Dkt. 1-1 at FIGs. 16a-c, color-coded, annotated, and arrows added.)

1    ***The Asserted Claims require that the "tissue anchor" have a leading "barb***

2    ***end" with two features: 1) a tip shaped to penetrate soft tissue so that the tissue***

3    ***anchor itself, as opposed to the delivery device, can penetrate the tissue, and 2)***

4    ***barbs.***  (*See* Dkt. 1-1 at Cls. 1, 4, and 8.)  As discussed above, the tissue anchor is

5    advanced into tissue upon operation of the plunger of the delivery device.  But in

6    order to be able to do that, the patent specification describes that either the ***delivery***

7    ***device*** has to be shaped to penetrate the tissue or the ***tissue anchor*** itself has to be

8    shaped to penetrate the tissue.  (*See* Dkt. 1-1 at 7:19-23; 7:25-26; 9:38-41.)  The

9    Asserted Claims clarify that it is the tissue anchor, not the delivery device, that has a

10   "tip shaped to penetrate soft tissue."  (Dkt.

11   1-1 at Cl. 1.)

12   At right, Figure 4a shows a pointed tip at

13   "barb end 21" of the tissue anchor that is

14   "shaped to penetrate soft tissue" (tissue

15   anchor shown in yellow, tip circled in red).

16   (Dkt. 1-1 at FIG. 4a (annotated and colored).)  The specification also describes an

17   anchor with a "sharp end" to penetrate.  (*Id.* at 9:37-41; 13:29-31.)



18        In addition to having a "tip shaped to penetrate soft tissue," the "barb end" is

19   the leading portion of the tissue anchor and has barbs.  It is a different portion than

20   the "attachment member," which is distal

21   or trailing to the "barb end," as shown in

22   Figure 4a at right.  (*See* Dkt. 1-1 at FIG.

23   4a; Abstract ("The anchor shaft has an

24   attachment member ***distal*** from the barb

25   end for direct attachment to a tissue or for

26   attachment of sutures or slings."); 2:67-3:3 ("The shaft of the anchor has an

27   attachment member ***distal*** from the barb end so that the attachment member may



28

attach directly to tissue or attach to tissue using sutures or a sling."); 6:45-48

("attachment member 23 (*see* FIGs. 4a, 4c, and 4e) positioned on shaft 120 ***distal***

from barb end 21."); Cl. 2.)

## C.    The Accused Solyx Systems.

TAI accused Boston Scientific's Solyx SIS Systems of infringing the '190

Patent.[4]  The disputed terms in this case all relate to Boston Scientific's non-

infringement defenses.  Accordingly, a brief overview of relevant features of Boston

Scientific's accused Solyx systems is provided below for context.

The Solyx Systems[5] are mid-urethral slings used to treat stress urinary

incontinence and prolapse in women.  Boston Scientific's Solyx Systems consist of

two parts: (1) the mesh assembly, comprised of a mesh component (blue portion

labeled below on left) and two mesh carriers (clear portions labeled below on left),

and (2) the delivery device (labeled below on left).  Below on the right is a close-up

diagram of a mesh carrier (shown in yellow and labeled below) and mesh assembly

loaded on the tip of a delivery device (shown in gray and labeled below).



In the accused Solyx Systems, it is the tip of the delivery device that extends

through the mesh carrier and is used to penetrate tissue.  Also, the mesh carriers are

---

[4] The '190 Patent issued in 2003.  TAI waited 16 years from the date the '190 Patent was issued to file this lawsuit.
[5] The accused products include the Solyx Single Incision Sling System and Solyx Blue Single Incision Sling System.  The differences between the two products are not relevant to this litigation.

designed with barbs on the ***trailing*** end of the carrier where the mesh carrier attaches to the mesh (as shown above).

The Solyx Systems deposit the mesh carrier in a completely different way than the Asserted Claims. In particular, while the "plunger" in the Asserted Claims pushes the mesh carrier ***forward*** once the carrier has been placed in the optimized tissue location, the delivery device in the accused Solyx Systems deploys the mesh carrier by retracting the handle of the delivery device ***backwards***. (*See, e.g.*, Ex. 1, BSCTAI-00003958 (noting the delivery device is "[d]esigned to seat carrier where placed").) This is shown in the figures below, which are excerpts from Solyx product literature, where (1) the mesh carrier is first mounted upon the delivery device tip (labeled step 3 below); (2) the delivery device is then inserted into the patient to position the mesh carrier (labeled step 4 below); and (3) once proper placement of the mesh carrier has been achieved within the patient, the physician pulls ***"back"*** on the delivery device handle to pull the delivery device tip backward into its plastic, protective sheath, thereby leaving the mesh carrier in place (labeled step 5 below):



Place the mesh assembly onto the delivery device by placing the delivery device tip into the mesh carrier. NOTE: The mesh carrier should be pushed onto the delivery device tip until it is flush with the end of the delivery device shoulder. While placing the mesh carrier onto the delivery device, make sure that the mesh is oriented so that it lies on the outside curve of the delivery device. The mesh is now ready for placement.



Insert the delivery device into the dissection pathway targeting placement of the carrier at a 45° angle of the midline. Advance the delivery device towards the obturator foramen just lateral to the inferior pubic ramus until the midline mark on the delivery device is approximately at the midline position under the urethra.



Deposit the carrier by gripping the deployment mechanism with one hand and pulling the delivery device handle back with the other hand. This action will deposit the carrier into the surrounding obturator internus muscle tissue releasing it from the delivery device.

1   (*See* Dkt. 1-4 at 5.)  Below on the left is a diagram of the delivery device in a

2   configuration with the tip exposed to load a mesh carrier onto the tip for delivery (as

3   in step 3 above), and a second configuration on the right after the handle has been

4   pulled back to withdraw the tip into a sheath to deposit the mesh carrier (as in step 5

5   above).



17   **D.**   **The *Astora* Case.**

18        Although not necessarily dispositive, it is appropriate for a court to give

19   deference to claim constructions of prior litigation given "the importance of

20   uniformity in the treatment of a given patent" by the courts.  *Markman v. Westview*

21   *Instruments, Inc.*, 517 U.S. 370, 390 (1996); *see also Finisar Corp. v. DirecTV*

22   *Group, Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) ("Given the importance of

23   uniformity in the treatment of a given patent . . . this court would be remiss to

24   overlook another district court's construction of the same claim terms in the same

25   patent as part of this separate appeal.  In the interest of uniformity and correctness,

26   this court consults the claim analysis of different district courts on the identical terms

27   in the context of the same patent.") (citations and quotations omitted).  On October

28

28, 2015, TAI asserted the '190 Patent against Astora Women's Health, LLC.  (*See* Ex. 2, *Astora*, No. 2:15-cv-00473 (E.D.Va.), Dkt. 1.)  During the claim construction proceedings, TAI advocated for particular constructions of terms and phrases also at issue in this case.  For example, in the *Astora* case, TAI persuaded the court to construe "plunger" to mean "a member adapted to slide *forward* within the housing of the delivery device when a force is applied to the member." (Dkt. 28-1, Ex. 1 at 26-27; Ex. 3, *Astora* Transcript of Proceedings of the Claim Construction Hearing ("*Astora* Tr.") at 80:16-19; *see also id.* at 79:14-21, 79:23-25.)  TAI also persuaded the court in the *Astora* case to clarify that the "tip shaped to penetrate soft tissue" modifies the "barb end," (Dkt. 28-1, Ex. 1 at 16), and generally agreed that "barb end" meant "the leading portion of the tissue anchor having at least one or more barbs positioned thereon," (*id.* at 17).   The court in *Astora* made the following claim construction determinations for terms and phrases relevant in this litigation:

| Term/Phrase | *Astora* Court's Construction |
|---|---|
| "plunger" | "a member adapted to slide forward within the housing of the delivery device when a force is applied to the member" (Dkt. 28-1, Ex. 1 at 26-27.) |
| "tissue anchor" | "a device capable of being inserted in or through soft tissue and being retained after insertion"   (*Id.* at 15.) |
| "barb end . . . with a tip shaped to penetrate soft tissue . . ." | "the leading portion of the tissue anchor having at least one or more barbs positioned thereon"  (*Id.* at 17.) |
| "attachment member" | "engageable structure on or connected to the tissue anchor for attaching one or more other items"  (*Id.* at 21.) |
| "said anchor being advanced away from said housing upon operation of said plunger" | "the anchor is advanced and released from the housing when the plunger is moved within the housing"  (*Id.* at 24.) |

As TAI already represented to this Court:  "TAI agree[s] that TAI is bound by the constructions in [the *Astora*] case."  (Dkt. 24 at 16.)

9

### III.   LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (citation omitted).  "When the meaning or scope of a patent claim is in dispute the court construes the claim as a matter of law." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)).  When construing claims, the Court begins with the plain meaning of the claims themselves, and considers intrinsic evidence including the patent specification and prosecution history.  *Phillips*, 415 F.3d at 1314-18.  "[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. at 1315 (quoting *Markman*, 52 F.3d at 979).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

A court may also examine extrinsic evidence—i.e., "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317.  A court may "consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).

### IV.   UNDISPUTED TERMS

The parties agree to the following constructions, which were adopted by the court in the *Astora* case.

| Term/Phrase | Agreed Upon Construction |
|---|---|
| "tissue anchor" | "a device capable of being inserted in or through soft tissue and being retained after insertion" |

| "attachment member" | "engageable structure on or connected to the tissue anchor for attaching one or more other items" |
|---|---|

## V.   DISPUTED "PLUNGER" TERMS

In its LPR 4-2 Proposed Constructions pleading in this case, TAI admitted that the meaning of the term "plunger" is "a member adapted to slide *forward* within the housing of the delivery device when a force is applied to the member."  (Ex. 5 at A-3.)  This was the same construction for which it successfully advocated in the *Astora* case.  (Dkt. 28-1, Ex. 1 at 26-27; Ex. 3, *Astora* Tr. at 80:16-19; *see also id.* at 79:14-21, 79:23-25); *Finjan, Inc. v. Symantec Corp.*, 2017 WL 550453, at *3 (N.D. Cal. Feb. 10, 2017) ("When engaging in claim construction, district courts have granted 'reasoned deference' to claim construction orders outside their jurisdiction that address the same term in the same patent, given the importance of uniformity in claim construction.").  TAI also previously agreed in this case that it was bound to the constructions in the *Astora* case.  (Dkt. 24 at 16.)  Thus, "plunger" should not be a disputed term, and TAI should not be alleging infringement by Boston Scientific.  As explained above, the "deployment mechanism" in the Solyx Systems is only able to deposit the "mesh carrier" by "pulling the delivery device handle *back*"—i.e., there is no scenario where the Solyx Systems have a "plunger" that moves "forward" to release the mesh carrier.

But, apparently recognizing that it cannot succeed if the "plunger" must move "forward" to release the tissue anchor, in the Joint Claim Construction Statement, TAI tries to move away from the prior construction of "plunger," asserting that it is not "required" to include the word "forward" in the construction for "plunger."  (Dkt. 58-1 at A-7.)  TAI should not be allowed to take this shifting sands approach to claim construction.  The Court should reject TAI's new position, and confirm that the "plunger" is "a member adapted to slide *forward* within the housing of the

delivery device when a force is applied to the member" as such construction most closely aligns with the intrinsic and extrinsic evidence.[6]

TAI takes the same tactic with the phrase "upon operation of said plunger," in a blatant attempt to change the meaning of "plunger," which it previously admitted in the *Astora* litigation should mean "slide ***forward*** within the housing," to somehow include the opposite—slide "***backward***." The phrase "upon operation of said plunger" does not change the fact that the "plunger" moves forward or that the tissue anchor is only "advanced" from the housing when the "plunger" moves "forward." The Court should reject all of TAI's attempts to change the meaning of "plunger."

**A. "plunger" / "a plunger slidably positioned in said housing" (Claim 1).**

| Claim Term | BSC's Construction | TAI's Construction |
|---|---|---|
| **"plunger"** <br> (*term proposed by BSC*) | "a member adapted to slide forward within the housing of the delivery device when a force is applied to the member" | "a member adapted to slide [[forward]] within the housing of the delivery device when a force is applied to the member" |
| **"a plunger slidably positioned in said housing"** <br> (*term proposed by TAI*) | "a member adapted to slide forward within the housing of the delivery device when a force is applied to the member, where the member is slidably positioned in the housing" | "a plunger positioned in the housing so as to be capable of sliding forward or both forward and backward" |

Whether construed as a stand-alone term (as proposed by Boston Scientific) or in the phrase "a plunger slidably positioned in said housing" (as proposed by TAI), Boston Scientific's construction that a "plunger" means "a member adapted to slide forward within the housing of the delivery device when a force is applied to the member" is consistent with the intrinsic and extrinsic evidence and should be adopted. Indeed, this is the very construction that TAI not only advocated for and obtained in the *Astora* case, but is the construction TAI proposed in its LPR 4-2

---

[6] The Court should reject TAI's proposed construction of the overall phrase "a plunger slidably positioned in said housing" for all the same reasons.

Proposed Constructions *in this case*.  (Ex. 5 at A-3 (admitting that "plunger" is "a member adapted to slide *forward* within the housing of the delivery device when a force is applied to the member.").)  TAI cannot change the meaning of "plunger" simply to fit its baseless infringement claim.

### 1.  The intrinsic evidence.

"[T]he claims themselves provide substantial guidance as to the meaning of" the term "plunger."  *Phillips*, 415 F.3d at 1314.  The Asserted Claims specify that "said anchor [is] *advanced* away from said housing upon operation of said plunger." This language makes clear that the plunger operates to advance the anchor away from the housing.  The plunger achieves this by sliding forward within the housing, pushing the tissue anchor away from the housing and "plunging" it into the tissue.

The '190 Patent's specification confirms this.  The specification, which "is the single best guide to the meaning of a disputed term," *Phillips*, 415 F.3d at 1315, consistently describes the operation of the plunger as "***advancing***" within the housing—i.e. moving forward—in order to advance the tissue anchor away from the housing, thereby releasing it from the housing of the delivery device.  (*See, e.g.*, '190 Patent at 6:9-11; 9:27-55; 9:41-46; 10:67-11:2; 16:34-36; 17:2-8; 19:12-14.)

In particular, the specification describes the claimed tissue anchor system as one in which the "tissue anchor" is initially connected to the "housing."  (*E.g.*, '190 Patent at 9:27-29; 14:25-27 ("[A]s shown in FIG. 13, housing 2 may have a hollow barrel portion 7 that is adapted to have anchor 120 positioned at least partially therein.").)  This fact was also undisputed in the *Astora* case.  (Ex. 3, *Astora* Tr. at 73:10-13 (TAI's counsel: "[T]he anchor is connected to the housing.  We all agree on that.  When the delivery device is set up for use, they're connected in some way.").)  In order to disconnect the anchor from the housing, the "plunger" operates to advance—i.e., move forward to ***push***—the anchor away from the housing and into the patient's tissue.  (*E.g.*, '190 Patent at 5:66-6:11; 9:33-36; 9:41-46; 10:67-11:1.)

1    This fact was also undisputed in the *Astora* case.  As counsel for TAI described it:
2    "Then you use the plunger to get the anchor off of the housing . . . Now, ***it's pushing***
3    ***it away, obviously***.  That's how they get disconnected."  (Ex. 3, *Astora* Tr. at 73:14-
4    17.)  In particular, a force is applied to the plunger, causing the plunger to slide
5    forward within the housing of the delivery device, which in turn ***pushes*** the anchor
6    away from the housing and into the tissue.  (*E.g.*, '190 Patent at 16:63-17:6; *see also*
7    Ex. 3, *Astora* Tr. at 79:5-7 (TAI's counsel agreeing that "you have to apply some
8    force to this thing [the plunger] in order to get it to work").)  This description is
9    reflected in the *Astora* court's construction of "plunger"—"a member adapted to
10   ***slide forward*** within the housing of the delivery device when a force is applied to the
11   member."

12         Every description and depiction of a "plunger" in the '190 Patent is consistent
13   with this construction.  *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d
14   1331, 1338 (Fed. Cir. 2006) ("In general, the scope and outer boundary of claims is
15   set by the patentee's description of his invention.").  The '190 Patent describes
16   multiple embodiments in which the plunger operates by "advancing" (i.e., sliding
17   forward) within the housing, so as to push the anchor away from the housing and
18   into the tissue.  (*See, e.g.*, '190 Patent at 6:9-11 ("Anchor end 10 can have any
19   structure engaging anchor 20 that allows plunger 5 to advance anchor 20 into a tissue
20   and uncouple therefrom, leaving anchor 20 in tissue."); 9:33-36 ("When hollow
21   barrel portion 7 is advanced so that sharp end 125a clears the tissue or is embedded
22   therein, plunger 5 is advanced, releasing anchor 20."); 9:41-46 ("In this embodiment,
23   hollow barrel portion 7 is placed against the tissue, and plunger 5 is advanced,
24   forcing anchor 20 into tissue."); 10:67-11:1 ("Plunger 5 is depressed and advances
25   anchor 20 into the space . . . ."); 19:12-14.)

26         As discussed above, it is also clear from the figures in the patent that the
27   plunger works by sliding ***forward*** within the housing of the delivery device.

28

1  (*See* FIGs. 2, 7a, 7b, 13.)  Again, the only series of figures that show the movement

2  of a plunger in relation to a housing and an anchor shows the plunger moving

3  forward within the housing to move the anchor forward (*see* FIGs. 16a-c (annotated,

4  color-coded, and arrows added below)):



15  By contrast, the '190 Patent discloses no embodiment and gives no examples

16  in which a plunger operates by retracting (i.e., sliding backward) within the housing,

17  so as to somehow push the tissue anchor away from the housing and into a tissue.

18  Indeed, a "plunger" sliding backwards through the housing would not exert the force

19  on the tissue anchor needed to push the anchor away from the housing and into the

20  tissue.  *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296,

21  1305 (Fed. Cir. 2011) ("In reviewing the intrinsic record to construe the claims, we

22  strive to capture the scope of the actual invention, rather than . . .  allow the claim

23  language to become divorced from what the specification conveys is the invention.").

24  TAI's illogical construction finds no support in the intrinsic evidence and must be

25  rejected.  *Id.*; *see also AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1278

26  (Fed. Cir. 2011) ("[A] construction that renders the claimed invention inoperable

27  should be viewed with extreme skepticism.").

28

1    The Court should similarly adopt Boston Scientific's construction of the

2  overall "plunger" phrase, which incorporates the construction of "plunger," such that

3  "a plunger slidably positioned in said housing" becomes "a member adapted to slide

4  forward within the housing of the delivery device when a force is applied to the

5  member, where the member is slidably positioned in the housing."  The phrase

6  "slidably positioned in said housing" merely indicates the structural relationship of

7  the "plunger" and the "housing"—i.e., the "plunger" is slidably positioned in the

8  housing.  It does not change the meaning of "plunger."

9              **2.      The extrinsic evidence.**

10   The extrinsic evidence further supports Boston Scientific's proposed

11 constructions.  *See Phillips*, 415 F.3d at 1322 (explaining that courts may rely on

12 extrinsic evidence such as dictionary definitions "so long as the dictionary definition

13 does not contradict" the intrinsic evidence).  The American Heritage Dictionary

14 defines "plunger" as "a machine part, such as a piston, that operates with a thrusting

15 or plunging movement."  (Ex. 6.)  A plunger is used to ***push*** some other object, and

16 the "thrusting or plunging motion" occurs along the direction that one wishes to push

17 that object.  This is consistent with Boston Scientific's proposed construction, which

18 specifies that the "plunger" operates by moving "forward" within the housing to

19 push (i.e., "plunge") the tissue anchor into the patient's tissue.  (*See* Ex. 3, *Astora* Tr.

20 73:14-17 (TAI's counsel: "Then you use the plunger to get the anchor off of the

21 housing . . . Now, ***it's pushing it away, obviously***.  That's how they get

22 disconnected.").)

23   The unreasonableness of TAI's position is highlighted by the fact that in the

24 *Astora* case, TAI's counsel argued against the very construction TAI now proposes

25 in this case:

26   The two problems we have with the defendant's construction—one is this
   issue of sliding ***forward and backward.***  It's perfectly fine as long as it
27   goes forward.  It's ***not necessary that the plunger has to go forward and
   backward.***  It will accomplish what the claim requires if inside the device
28

16

the physician hits a button and *the plunger goes forward* and disengages the anchor.  That's all that has to happen.  Why it has to go backwards, I don't know.  *The patent does not use the words "forward and backwards" to describe the operation of the plunger.*

(Ex. 3, *Astora* Tr. at 79:16-25; *see id.* at 80:14-22.)  In short, TAI knows the constructions it now proposes for the disputed plunger terms are not correct.  Indeed, TAI admitted in its LPR Proposed Constructions pleading *in this case* that "plunger" means "a member adapted to slide forward within the housing of the delivery device when a force is applied to the member."  (Ex. 5 at A-3.)  The only reason TAI is pursuing these unreasonable constructions now is because it knows that the Solyx Systems did not infringe if the "plunger" must move forward to release the tissue anchor.

* * *

Accordingly, for all these reasons, the Court should adopt Boston Scientific's proposed constructions, which simply confirm that the "plunger" must slide "forward" within the housing, which is consistent with the claim language and specification, and common understanding of a "plunger."

**B.  "said anchor being advanced away from said housing upon operation of said plunger" / "upon operation of said plunger" (Claim 1).**

| Claim Term | BSC's Construction | TAI's Construction |
|---|---|---|
| "**said anchor being advanced away from said housing upon operation of said plunger**" (*term proposed by BSC*) | "the anchor is advanced and released from the housing when the plunger is moved forward within the housing" | "the anchor is advanced and released from the housing upon operation of said plunger" |
| "**upon operation of said plunger**" (*term proposed by TAI*) | "when the plunger is moved forward within the housing" | "when the plunger is moved in any direction within the housing" |

While Boston Scientific proposes the longer phrase for construction "said anchor being advanced away from said housing upon operation of said plunger," as

17

opposed to just "upon operation of said plunger" (as proposed by TAI), the parties only disagree about the meaning of "upon operation of said plunger."  The parties agree that "said anchor being advanced away from said housing" means "the anchor is advanced and released from the housing."

Accordingly, the parties' dispute involves essentially the same dispute as above: whether a "plunger" must move "forward" (as Boston Scientific proposes) or whether a "plunger" could instead move "backward" or in some other direction (as TAI proposes).  In particular, TAI asks the Court to construe these phrases to mean that the tissue anchor is released when the "plunger" is "moved in *any direction* within the housing."  In other words, TAI wants the Court to construe this last limitation—"upon operation of said plunger"—to cover devices in which the tissue anchor is somehow released by a "plunger" that moves "backward."  TAI's construction is not permitted by the intrinsic evidence or the common understanding of a "plunger," and it is also directly contradicted by its own prior admission as to the meaning of a "plunger"—as moving "forward"—and the district court's previous construction in the *Astora* case.

As discussed above, a "plunger" is "a member adapted to slide *forward* within the housing of the delivery device when a force is applied to the member."  And as also discussed above, the intrinsic record confirms that the "plunger" in the Asserted Claims is only able to "advance" the tissue anchor by pushing the tissue anchor forward.  (*See, e.g.*, '190 Patent at 5:66-6:11; 9:33-36; 9:41-46; 10:67-11:1; 19:12-14.)  Accordingly, for all of the reasons set forth above, "upon operation of said plunger" means "when the plunger is moved forward within the housing."

C.     **TAI Should Be Estopped From Changing Its Position On "Plunger."**

As explained above, Boston Scientific's proposed constructions of the disputed "plunger" terms are correct and should be adopted.  In addition, it is fully

within the Court's discretion to estop TAI from pursuing contradictory definitions of "plunger," including under principles of collateral and judicial estoppel.

"In a Ninth Circuit patent case, collateral estoppel applies if '(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party in the first proceeding.'" *Neev v. Alcon Labs., Inc.*, SACV1500336JVSJCGX, 2016 WL 9051170, at *12 (C.D. Cal. Dec. 22, 2016) (quoting *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000)), *aff'd sub nom. Neev v. Alcon Lensx Inc*, 774 F. App'x. 680 (Fed. Cir. 2019) (unpublished). All of these requirements are met here.  First, the meaning of the term "plunger" was previously decided in the *Astora* litigation.  "[I]n the Ninth Circuit, an issue is 'necessarily decided' if a court issues a claim construction order—even if the parties then settle." *Id.* at *12 n.4.  Second, the *Astora* case ended in a settlement and voluntary dismissal and, therefore, "ended in a final judgment on the merits because, in the Ninth Circuit, a court-approved settlement is a final judgment on the merits." *Id.*  Third, TAI was a party to the *Astora* litigation.  Accordingly, under the doctrine of collateral estoppel, the Court should preclude TAI from pursuing a different construction of the term "plunger" in this litigation—TAI "does not get another bite at the apple." *Curtiss-Wright Flow Control Corp. v. Z & J Techs. GmbH*, 563 F. Supp. 2d 1109, 1122 (C.D. Cal. 2007) (applying collateral estoppel to adopt claim construction ruling of other court in prior litigation); *see also*, *Int'l. Gamco, Inc. v. Multimedia Games Inc.*, 732 F. Supp. 2d 1082, 1092 (S.D. Cal. 2010) (same).

Judicial estoppel is equally applicable.  "Judicial estoppel applies to patent claim construction" and prohibits parties "from abandoning their earlier, successfully advanced claim construction positions." *Kaneka Corp. v. Zhejiang Med. Co.*, No. CV1702389SJOSHSX, 2018 WL 2718036, at *22 (C.D. Cal. Apr. 5, 2018), *aff'd*,

19

767 F. App'x 998 (Fed. Cir. 2019); *see also Kruse Tech. P'ship v. DMAX, Ltd.*, No. CV0904970JVSRNBX, 2010 WL 11519252, at *2 (C.D. Cal. Sept. 21, 2010) (Selna, J.) (holding that judicial estoppel precluded patentee from asserting inconsistent claim construction).[7]

For judicial estoppel to apply, "[f]irst, a party's later position must be 'clearly inconsistent' with its earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). TAI's positions are clearly inconsistent. In the *Astora* litigation, TAI "agreed that . . . the proper construction [of 'plunger'] is: 'a member adapted to slide forward within the housing of the delivery device when a force is applied to the member.'" (Dkt. 28-1, Ex. 1 at 26.) Here, TAI asserts that the plunger does not need to slide "forward." (Dkt. 58-1 at A-7.) "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'" *New Hampshire*, 532 U.S. at 750. During the *Astora* claim construction hearing, it was TAI's counsel who proposed a modified construction of "plunger" that both parties—and the court—agreed on: "So if we said, 'a member adapted to slide within the housing'—or we could say 'forward'—'of the delivery device when a force is applied to the member.'" (Ex. 3, *Astora* Tr. at 80:16-19; *see also id.* at 79:14-21, 79:23-25.) Accordingly, the *Astora* court construed plunger to mean "a member adapted to slide forward within the housing of the delivery device when a force is applied to the member." (Dkt. 28-1, Ex. 1 at 26.) "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750. TAI claims to have settled with Astora on favorable

---

[7] Regional circuit law governs the application of judicial estoppel in patent cases. *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000) (applying Seventh Circuit law).

terms shortly after claim construction. (Ex. 7.) It would be unfair for TAI to benefit from its prior claim constructions against Astora, only to then be allowed to back-pedal and advance a new and inconsistent set of constructions against Boston Scientific. Accordingly, TAI is estopped from changing its position on "plunger."

## VI. DISPUTED "BARB END" TERMS

TAI is also trying to move away from the constructions it previously advanced and obtained in the *Astora* case for the "barb end" terms. The Court should reject TAI's arguments, and confirm that the "barb end" is the leading portion of the tissue anchor with a "tip shaped to penetrate soft tissue."

### A. "barb end . . . with a tip shaped to penetrate soft tissue" (Claim 1).

| Claim Term | BSC's Construction | TAI's Construction |
|---|---|---|
| "**barb end . . . with a tip shaped to penetrate soft tissue**" (*term proposed by BSC*) | "the leading portion of the tissue anchor having at least one or more barbs positioned thereon with a tip shaped to penetrate soft tissue" | No construction proposed. TAI instead proposes construing "said anchor having a barb end and a barb with a tip shaped to penetrate soft tissue positioned thereon" |
| "**said anchor having a barb end and a barb with a tip shaped to penetrate soft tissue positioned thereon**" (*term proposed by TAI*) | "said anchor having a leading portion with at least one or more barbs and a tip shaped to penetrate soft tissue positioned on the leading portion" | "said anchor consisting of at least a leading portion that is inserted into soft tissue with at least one or more barbs positioned thereon and a tip shaped to penetrate the soft tissue" |

Claim 1 requires that the anchor have a "barb end and a barb with a tip shaped to penetrate soft tissue positioned thereon." The parties largely agree with the *Astora* court's previous construction of "barb end" to mean "the leading portion of the tissue anchor having at least one or more barbs positioned thereon." (Dkt. 28-1, Ex. 1 at 16.)[8] The parties' dispute centers around where the "tip shaped to penetrate soft

---

[8] Boston Scientific notes that it disagrees with TAI's requirement that the "barb end" "is inserted into soft tissue," as such construction appears to mix method and apparatus limitations. Such a construction may present invalidity issues as well as

tissue" is located on the tissue anchor.  Boston Scientific's proposed construction makes clear that the "tip shaped to penetrate soft tissue" is located on the "barb end"—i.e., the leading portion of the tissue anchor.  By contrast, TAI's proposed construction permits the "tip shaped to penetrate soft tissue" to be located anywhere on the tissue anchor.

The unreasonableness of TAI's position is again shown by its prior admission in the *Astora* case, where TAI argued (successfully) that "the phrase 'with a tip shaped to penetrate soft tissue' should be construed as ***modifying the 'barb end'*** of the tissue anchor . . . ."  (Ex. 4, *Astora* Dkt. 38 at 12 n.1.)  TAI now takes the opposite position.  TAI's new position is not reasonable or supported by the evidence.  This dispute is dispositive because under Boston Scientific's correct construction of "barb end . . . with a tip shaped to penetrate soft tissue," the accused Solyx Systems did not meet this limitation and therefore could not have infringed any of the Asserted Claims while the '190 Patent was still in force.[9]

**1.  The intrinsic evidence.**

Again, "the claims themselves provide substantial guidance as to the meaning of" the disputed "barb end" phrases.  *Phillips*, 415 F.3d at 1314.  Claim 1 recites "said anchor having a barb end and a barb with a tip shaped to penetrate soft tissue positioned thereon" and separately recites an "attachment member."  Claim 1, therefore, clarifies that the "barb end" is distinct from the "attachment member," and that the "barb end" has a "tip shaped to penetrate soft tissue."

The '190 Patent's specification confirms that the "tip shaped to penetrate soft tissue" modifies the "barb end" as opposed to the "tissue anchor" in general.  Each time the '190 Patent discusses a tissue anchor that is designed to penetrate soft tissue,

_____

proof of infringement issues.  However, the parties' main dispute relates to the location of the "tip shaped to penetrate soft tissue."

[9] Boston Scientific's accused Solyx Systems also did not infringe under TAI's proposed construction.  As explained above, the only portion of the accused systems that has a tip suitable for penetrating tissue is the delivery device, not the frustoconical tissue anchors.

the tissue anchor is described as having one "end" of the anchor being shaped to penetrate soft tissue.  (*See, e.g.*, Dkt. 1-1 at 7:25-26 ("***Barb end*** 21 may also be shaped to penetrate a tissue"); 9:37-41 ("[A]nchor 20 should be equipped with a ***sharp end*** . . . designed to penetrate a tissue."); 13:29-31 ("Barb end 101 may be a variety of shapes but is easily insertable into tissue, generally having a ***sharp end*** 125"); *see also* 15:9-10 ("Shaft tip 120b may be sharp so that it can penetrate a tissue").)  Indeed, during prosecution of the '190 Patent, Walshe disclaimed tissue anchors with ends that were not sufficiently pointed or sharp to penetrate soft tissue. (Ex. 8, 7/26/2002 Resp. to Office Action, pp. 7-9.)  Walshe distinguished the cited prior art references because they disclosed an anchor with "a rather blunt or rounded tip which obviously is not shaped to penetrate soft tissue."  (*Id.* at 8.)  And even if the prior art references may have had other portions on the tissue anchor that would penetrate the tissue, such as barbs, Walshe distinguished those references as not disclosing a "tip shaped to penetrate soft tissue."

As discussed above, the parties agree that the "barb end" is the "leading portion" of the tissue anchor and has one or more "barbs."  The specification further confirms that the "barb end" is the leading portion of the tissue anchor because, as discussed above, the specification consistently describes the "attachment member" as being "distal" or trailing to the "barb end."  (*See* Dkt. 1-1 at FIG. 4a; Abstract ("The anchor shaft has an attachment member ***distal*** from the barb end"); 2:66-3:3 ("The shaft of the anchor has an attachment member ***distal*** from the barb end"); 6:45-48 ("attachment member 23 (*see* FIGs. 4a, 4c, and 4e) positioned on shaft 120 ***distal*** from barb end 21."); Cl. 2.)  This is shown in Figure 4a, above, which shows the "attachment member" distal or trailing to the "barb end."  (*Id.* FIG.



FIGURE 4a

4a.)  Thus, the "barb end" is the leading portion of the tissue anchor, which clearly has a "tip shaped to penetrate soft tissue."

### 2. The extrinsic evidence.

Boston Scientific's proposed construction is also supported by the extrinsic evidence.  The American Heritage Dictionary defines "tip" as "the end of a pointed or projecting object."  (Ex. 6; *see also* Taber's Cyclopedic Medical Dictionary (Ex. 9) (defining "tip" as "[a] point or apex of a part."); Mosby's Medical, Nursing, and Allied Health Dictionary (Ex. 10) (defining "tip" as "[t]he end of a pointed object."); New American Illustrated Webster's Dictionary (Ex. 11) (defining "tip" as "[t]he point or extremity of anything tapering; end."); Random House Webster's College Dictionary (Ex. 12) (defining "tip" as "[a] pointed end, esp. of something long or tapered.  The top; apex.")); *see Phillips*, 415 F.3d at 1322.  Thus, a "tip" is commonly understood as being at the end or the apex of an object.  This is consistent with Boston Scientific's proposed construction, which clarifies that the "tip shaped to penetrate soft tissue positioned thereon" is located on the "barb end"—the leading portion of the tissue anchor—as opposed to generally on the "tissue anchor."

The proceedings in the *Astora* case are also consistent.  TAI argued that "the phrase 'with a tip shaped to penetrate soft tissue' should be construed ***as modifying the 'barb end'*** of the tissue anchor . . . ."  (Ex. 4, *Astora* Dkt. 38 at 12 n.1.)  And, the *Astora* court adopted that construction.  (Dkt. 28-1, Ex. 1 at 15.)

\* \* \*

Accordingly, for all these reasons, the Court should adopt Boston Scientific's proposed constructions, which simply confirm that the "tip shaped to penetrate soft tissue" modifies the "barb end" of the "tissue anchor."

## B.   TAI Should Be Estopped From Changing Its Position On "Barb End."

The Court should also estop TAI from pursuing a contradictory definition of "barb end . . . with a tip shaped to penetrate soft tissue."  For the same reasons as

1    discussed above with respect to the "plunger" term, the doctrine of collateral

2    estoppel prevents TAI from abandoning its prior construction for "barb end . . . with

3    a tip shaped to penetrate soft tissue."  The meaning of the phrase was determined in

4    the *Astora* case, the case was settled, and TAI was a party to the case.  *Curtiss-*

5    *Wright*, 563 F. Supp. 2d at 1122; *see also*, *Int'l. Gamco*, 732 F. Supp. 2d at 1092.

6         Judicial estoppel also applies.  TAI's current position on the "barb end" terms

7    is "clearly inconsistent" with its position in the *Astora* case.  *New Hampshire*, 532

8    U.S. at 750.  In *Astora*, TAI argued that "***the phrase 'with a tip shaped to penetrate***

9    ***soft tissue' should be construed as modifying the 'barb end'*** of the tissue anchor . . .

10   ."  (Ex. 4, *Astora* Dkt. 38 at 12 n.1.)  TAI now argues in this case that the phrase

11   "with a tip shaped to penetrate soft tissue" should ***not*** be construed as modifying the

12   "barb end" of the tissue anchor, but the tissue anchor as a whole.  Having persuaded

13   the court to adopt its construction in the *Astora* case, and then having benefitted from

14   it through a favorable settlement, (Ex. 4, *Astora* Dkt. 38 at 12 n.1; Dkt. 28-1, Ex. 1 at

15   15), TAI should not be allowed to now take a different construction against Boston

16   Scientific, *see New Hampshire*, 532 U.S. at 750.

17                                  * * *

18        For all these reasons, Boston Scientific respectfully requests that the Court

19   construe "barb end . . . with a tip shaped to penetrate soft tissue" to mean "the

20   leading portion of the tissue anchor having at least one or more barbs positioned

21   thereon with a tip shaped to penetrate soft tissue."

22                          **VII. CONCLUSION**

23        For the foregoing reasons, Boston Scientific respectfully requests that the

24   Court adopt its proposed constructions for the disputed terms and phrases.

25

26

27

28

Dated: January 13, 2020

/s/ Timothy E. Grimsrud

FAEGRE BAKER DANIELS LLP
David J.F. Gross (SBN 290951)
Nick P. Chan (SBN 286925)
1950 University Avenue, Suite 450
East Palo Alto, CA 94303
Telephone: (650) 324-6700
Fax: (650) 324-6701
david.gross@FaegreBD.com
nick.chan@FaegreBD.com

Michael Jaeger (SBN 289364)
11766 Wilshire Blvd., Suite 750
Los Angeles, CA 90025
Telephone: (310) 500-2090
Fax: (310) 500-2091
michael.jaeger@FaegreBD.com

Timothy E. Grimsrud (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
Andrea I. Savageau (*pro hac vice*)
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Fax: (612) 766-1600
tim.grimsrud@FaegreBD.com
lauren.barta@FaegreBD.com
andrea.savageau@FaegreBD.com

*Attorneys for Defendant Boston Scientific Corporation*